# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
APPALACHIAN VOICES, et al.,                    )
                                               )
                    Plaintiffs,                )
                                               )
            v.                                 )        Civil Action No. 12-0523 (RBW)
                                               )
GINA MCCARTHY,[1]                              )        Consolidated Case Nos. 12-0585 (RBW)
In her official capacity as Administrator,     )                              12-0629 (RBW)
United States Environmental                    )
Protection Agency,                             )
                                               )
                    Defendant, and             )
                                               )
UTILITY SOLID WASTE                            )
ACTIVITIES GROUP, and                          )
                                               )
NATIONAL MINING ASSOCIATION,                   )
                                               )
                    Intervenor-Defendants.     )
_____ )

## MEMORANDUM OPINION

Plaintiffs Appalachian Voices, Chesapeake Climate Action Network, Environmental

Integrity Project, Kentuckians For The Commonwealth, Montana Environmental Information

Center, Moapa Band of Paiutes, Prairie Rivers Network, Physicians for Social Responsibility,

Southern Alliance for Clean Energy, Sierra Club, and Western North Carolina Alliance

(collectively, "Environmental Plaintiffs"), and plaintiffs Headwaters Resources, Inc.

("Headwaters") and Boral Material Technologies Inc. ("Boral") (collectively, "Marketer

Plaintiffs"), bring this suit against Gina McCarthy, in her official capacity as Administrator of

_____
[1] The plaintiffs filed suit against Lisa P. Jackson, then Administrator of the United States Environmental Protection Agency, in her official capacity. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Gina McCarthy, who succeeded Jackson as the Administrator.

the United States Environmental Protection Agency ("EPA"), pursuant to the citizen suit provision of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(2) (2012), alleging that the EPA has failed to timely review and revise certain regulations concerning coal ash,[2] in accordance with the provisions of that Act. See Complaint for Declaratory and Injunctive Relief, No. 12-0523 (Environmental Plaintiffs' Complaint, hereinafter "Envtl. Pls.' Compl.") ¶¶ 80–88; Complaint for Declaratory and Injunctive Relief, No. 12-0585 (Headwaters Complaint, hereinafter "Headwaters Compl.") ¶¶ 20–22; Complaint for Declaratory and Injunctive Relief, No. 12-0629 (Boral Complaint, hereinafter "Boral Compl.") ¶¶ 21–23. Cross-motions for summary judgment by the Environmental Plaintiffs, the Marketer Plaintiffs, the EPA, and intervenor-defendants Utility Solid Waste Activities Group and National Mining Association are currently before the Court. Upon careful consideration of the parties' submissions,[3] the Court concludes that it must grant summary judgment to the EPA on the Environmental Plaintiffs' first and third claims, and grant summary judgment in part to the

---

[2] The Court uses the term "coal ash" to refer collectively to fly ash waste, bottom ash waste, slag waste, and flue gas emission control waste generated primarily from the combustion of coal or other fossil fuels.

[3] In addition to the filings already referenced, the Court considered the following submissions, including all attached exhibits: (1) Plaintiffs Headwaters Resources, Inc. and Boral Material Technologies Inc.'s Memorandum in Support of Motion for Summary Judgment, ECF No. 18 ("Marketer Pls.' Mem."); (2) the Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 19-1 ("Envtl. Pls.' Mem."); (3) EPA's Combined Opposition to Plaintiffs' Motions for Summary Judgment, and Memorandum in Support of EPA's Cross-Motion for Summary Judgment in Case Nos. 1:12-CV-00585 and 1:12-CV-00629, and for Partial Summary Judgment and Order to Govern Further Proceedings in Case No. 1:12-CV-00523, ECF Nos. 24-1, 25 ("EPA's Mem."); (4) Memorandum of Points and Authorities of Intervenor-Defendants Utility Solid Waste Activities Group and National Mining Association in Support of the Attached Joint Motion for Summary Judgment and in Opposition to the Plaintiffs' Motions for Summary Judgment, ECF Nos. 26, 27 ("Intvs.' Mem."); (5) Plaintiffs Headwaters Resources, Inc. and Boral Material Technologies Inc.'s Combined Opposition to Defendant EPA's and Intervenor-Defendants' Motions for Summary Judgment and Reply, ECF Nos. 28, 29 ("Marketer Pls.' Opp'n"); (6) the Plaintiffs' Opposition to EPA's Cross-Motion for Partial Summary Judgment and to Intervenor-Defendants' Motion for Summary Judgment and Reply to EPA's and Intervenor-Defendants' Oppositions to Plaintiffs' Motion for Summary Judgment, ECF Nos. 30, 31 ("Envtl. Pls.' Opp'n"); (7) the Memorandum of Intervenor-Defendants Utility Solid Waste Activities Group and National Mining Association in Reply to Plaintiffs' Responses to Intervenor-Defendants' Joint Motion for Summary Judgment, ECF No. 32 ("Intvs.' Reply"); and (8) EPA's Reply in Support of EPA's Cross-Motion for Summary Judgment in Case Nos. 1:12-CV-00585 and 1:12-CV-00629, and for Partial Summary Judgment and Order to Govern Further Proceedings in Case No. 1:12-CV-00523, ECF No. 33 ("EPA's Reply").

Environmental Plaintiffs and to the Marketer Plaintiffs on their shared claim for the reasons described below.

# I. BACKGROUND

## A. The Resource Conservation and Recovery Act and the Bevill Amendment

Congress enacted the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6987 (2012), "to establish a comprehensive federal program to regulate the handling of solid wastes." Envtl. Def. Fund v. U.S. EPA, 852 F.2d 1309, 1310 (D.C. Cir. 1988). To accomplish this objective, Congress authorized the Administrator of the EPA to "prescribe, in consultation with Federal, State, and regional authorities, such regulations as are necessary to carry out [the Administrator's] functions under this Act." Resource Conservation and Recovery Act of 1976 § 2002(a)(1), 42 U.S.C. § 6912(a)(1). The RCRA further provides that "[e]ach regulation promulgated under this Act shall be reviewed and, where necessary, revised not less frequently than every three years." Id. § 2002(b), § 6912(b). The Act also required the EPA, "[w]ithin one year of enactment of this section, and from time to time thereafter, . . . [to] develop and publish suggested guidelines for solid waste management." Id. § 1008(a), § 6907(a).

The RCRA created a two-prong approach to the regulation of solid wastes, which the Act defines, in pertinent part, as "any . . . discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations." Id. § 1004(27), § 6903(27). Subtitle C of the RCRA governs wastes classified as "hazardous," creating "a 'cradle to grave' federal regulatory system for [their] treatment, storage, and disposal." Am. Portland Cement Alliance v. EPA, 101 F.3d 772, 774 (D.C. Cir. 1996) (citation omitted). The EPA was charged with "develop[ing] and promulgat[ing] criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should

be subject to the provisions of this subtitle . . . ."  Resource Conservation and Recovery Act of 1976 § 3001(a), 42 U.S.C. § 6921(a).  The Act further provides that "[s]uch criteria shall be revised from time to time as may be appropriate."  Id.  Under the regulations subsequently promulgated, a waste is considered "hazardous" and subject to regulation under Subtitle C if it exhibits any one of four characteristics of hazardousness—ignitability, corrosivity, reactivity, or toxicity.  40 C.F.R. §§ 261.11(a)(1), 261.20–24 (2012).  The characteristic of toxicity is "the leaching of toxic residues into surrounding liquid," Envtl. Def. Fund, 852 F.2d at 1310, as determined using the Toxicity Characteristic Leaching Procedure ("Leaching Procedure") set forth in EPA Publication SW-846, 40 C.F.R. § 261.24.

Disposal of all other solid wastes is regulated under Subtitle D of the Act.  See Envtl. Def. Fund, 852 F.2d at 1310.  "Under Subtitle D, states use federal financial and technical assistance to develop solid waste management plans in accordance with federal guidelines."  Id.  The EPA is responsible for "promulgat[ing] regulations containing criteria for determining which facilities shall be classified as sanitary landfills and which shall be classified as open dumps," open dumps being prohibited under the Act.  Resource Conservation and Recovery Act of 1976 §§ 4004(a), (b), 42 U.S.C. §§ 6944(a), (b).  State plans must then provide for the disposal of solid waste in sanitary landfills and the closing or upgrading of existing open dumps.  Id. §§ 4003(3), (6), §§ 6943(3), (6).

As originally enacted, the RCRA directed the EPA to "conduct a detailed and comprehensive study on the adverse effects of solid wastes from active and abandoned surface and underground mines on the environment," including "the adequacy of means and measures currently employed . . . to dispose of and utilize such solid wastes and to prevent or substantially mitigate such adverse effects."  Resource Conservation and Recovery Act of 1976 § 8002(f), 42

U.S.C. § 6982(f).  This provision reflected Congress' determination that "'information on the potential danger posed by mining waste [was] not sufficient to form the basis for legislative action.'"  Envtl. Def. Fund, 852 F.2d at 1310 (quoting H.R. Rep. No. 94-1491, at 15 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6253).

Following the enactment of the RCRA, the EPA "attempted to develop a regulatory approach to various types of mining wastes."  Id. at 1311.  Dissatisfied with the EPA's intended course of action, Congress amended the RCRA with the so-called Bevill Amendment one month before the EPA's regulations went into effect.  Solite Corp. v. U.S. EPA, 952 F.2d 473, 478 (D.C. Cir. 1991).  The Amendment expanded the scope of the study mandated by § 8002(f), and required the EPA to complete and submit its study of mining wastes to Congress within twenty-four months after the Amendment's enactment.  Solid Waste Disposal Act of 1980 § 8002(n), 42 U.S.C. § 6982(n).  The Amendment then required that the EPA, "after public hearings and opportunity for comment, either determine to promulgate regulations" under Subtitle C for the mining wastes specified by the Bevill Amendment, "or determine that such regulations are unwarranted."  Id. § 3001(b)(3)(C), 42 U.S.C. § 6921(b)(3)(C).  The specified wastes were exempted from regulation as hazardous wastes under Subtitle C "until at least six months after the date of submission of the applicable study required to be conducted . . . and after promulgation of regulations in accordance with" the EPA's determinations concerning the necessity of regulating the enumerated wastes as hazardous wastes.  Id. § 3001(b)(3)(A), 42 U.S.C. § 6921(b)(3)(A).  The specified wastes included "[f]ly ash waste, bottom ash waste, slag waste, and flue gas emission control waste generated primarily from the combustion of coal or other fossil fuels."  Id. § 3001(b)(3)(A)(i), 42 U.S.C. § 6921(b)(3)(A)(i).  Thus, "[p]ending pursuit and completion of the mining waste studies and, thereafter, until [the] EPA's final

regulatory determination, the Bevill Amendment prohibited the Agency from regulating mining and mineral processing wastes as hazardous wastes within the compass of Subtitle C." Solite Corp., 952 F.2d at 478. Several months before the passage of the Bevill Amendment, the EPA adopted a regulation exempting fly ash waste, bottom ash waste, slag waste, and flue gas emission control waste from regulation under Subtitle C. 40 C.F.R. § 261.4(b)(4).

**B. The EPA's Bevill Amendment Determinations and Promulgation of Regulations**

The EPA missed its statutory deadline for submitting its study of mining wastes to Congress. Solite Corp., 952 F.2d at 478. It subsequently commenced and completed its Bevill Amendment regulatory determinations in 1993 and 2000 pursuant to a consent decree after various groups brought suit to force the EPA to comply with the Amendment's requirements. See 65 Fed. Reg. 32,214-01, 32,235 (May 22, 2000). The EPA concluded that regulation of coal ash as hazardous waste under Subtitle C was inappropriate, but indicated in both the 1993 and 2000 determinations that it would continue to assess whether increased regulation of coal ash under Subtitle D is appropriate. See 58 Fed. Reg. 42,466-01, 42,466 (Aug. 9, 1993); 65 Fed. Reg. at 32,214.

The EPA took no further actions to regulate coal ash under either Subtitle C or D until June 21, 2010, when it announced that it was considering two alternative options to increase regulation of coal ash. 75 Fed. Reg. 35,128-01, 35,128 (June 21, 2010). The first option was to "reverse its August 1993 and May 2000 Bevill Regulatory Determinations regarding [coal ash] and list these residuals as special wastes subject to regulation under subtitle C of [the] RCRA, when they are destined for disposal in landfills or surface impoundments." Id. Under the second option, the EPA "would leave the Bevill determination in place and regulate disposal of such materials under subtitle D of [the] RCRA by issuing national minimum criteria." Id. The

Agency noted that it "is not proposing to change the May 2000 Regulatory Determination for beneficially used[4] coal combustion residuals, which are currently exempt from the hazardous waste regulations." Id.

## C. The Current Litigation

The Environmental Plaintiffs filed this action on April 5, 2012, asserting three claims for relief based on the EPA's alleged failure to review and revise, as necessary, its solid waste disposal regulations at least every three years, as required by § 2002(b) of the RCRA. See Envtl. Pls.' Compl. ¶¶ 80–88. The Environmental Plaintiffs assert that the EPA has failed to fulfill this obligation with respect to (1) 40 C.F.R. § 261.4(b)(4), which provides that coal ash is not a hazardous waste, Envtl. Pls.' Compl. ¶¶ 80–82, (2) regulations under Subtitle D concerning coal ash, in particular, 40 C.F.R. §§ 257.3-3, 257.3-4, and 257.3-7, Envtl. Pls.' Compl. ¶¶ 83–85, and (3) 40 C.F.R. § 261.24, the toxicity characteristic for classification of hazardous wastes, Envtl. Pls.' Compl. ¶¶ 86–88.

Plaintiff Headwaters filed its complaint on April 13, 2012, alleging, as the Environmental Plaintiffs also do in their second claim for relief, that the EPA failed to review, and if necessary, revise its Subtitle D regulations regarding coal ash every three years as required by § 2002(b) of the RCRA. Headwaters Compl. ¶¶ 20–22. Boral instituted its suit on April 20, 2012, asserting this same claim for relief. See Boral Compl. ¶¶ 21–23. Both Headwaters and Boral market "coal combustion products," which incorporate coal ash into construction materials in order to improve the materials' performance. See Headwaters Compl. ¶ 7; Boral Compl. ¶ 7. In addition to marketing beneficial use products, Boral "provides coal-fired power generating plants with

---

[4] As explained in greater detail below, coal ash is "beneficially used" through its incorporation into a variety of products. See Boral Compl. ¶ 7; Headwaters Compl. ¶ 7.

on-site ash handling and management, environmental services and engineering services." Boral Compl. ¶ 7.

All three suits are brought pursuant to the RCRA's citizen suit provision, which provides that "any person may commence a civil action . . . against the Administrator where there is an alleged failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator," 42 U.S.C. § 6972(a)(2), and all of the plaintiffs request that the Court order the EPA to complete a review, and, if necessary, revision of the regulations identified in each complaint, see Envtl. Pls.' Compl. at 34 ¶¶ 2–3; Headwaters Compl. at 6 ¶¶ 2–3; Boral Compl. at 6 ¶¶ 2–3. Otherwise, however, the relief requested by the Environmental Plaintiffs and the Marketer Plaintiffs diverges. As clarified during summary judgment briefing, the Environmental Plaintiffs ask the Court to order the EPA to "complete a review of the regulation exempting coal ash from the definition of hazardous waste, the RCRA [S]ubtitle D regulations governing the disposal of coal ash as a solid waste, and the regulations that establish and govern the use of the Toxicity Characteristic Leaching Procedure." [Proposed] Order Granting Plaintiffs' Motion for Summary Judgment at 1–2, ECF No. 19-3. They further request that the Court order the EPA to "make a formal determination of whether revision of any or all of the aforementioned regulations is necessary," and to "revise those regulations" if the EPA determines that such revision is necessary, all within six months of the Court's entry of their proposed order. Id. The Marketer Plaintiffs, on the other hand, ask the Court to "order [the] EPA to issue a final determination stating whether it will revise its regulations for disposed [coal ash] under [S]ubtitle C or D of RCRA, or not at all, and [to] identify[] its authority for [the] same within three months of this Court's decision on [their] motion for summary judgment." Marketer Pls.' Mem. at 16–17.

Shortly after the plaintiffs each filed suit, the Court consolidated the three cases pursuant to a consent motion. The Utility Solid Waste Activities Group and the National Mining Association (collectively "Intervenor-Defendants") subsequently sought to intervene in the consolidated action. The Utility Solid Waste Activities Group is "an association of over one hundred and ten energy industry operating companies and associations" whose members "represent more than 73 percent of the total electric generating capacity of the United States and service more than 95 percent of the nation's consumers of electricity." Intvs.' Mem. at 1 n.1. The National Mining Association is "the national trade association representing[] the producers of most of America's coal, metals, industrial and agricultural minerals; the manufacturers of mining and mineral processing machinery, equipment and supplies; and engineering, transportation, financial and other businesses that serve the mining industry." Id. at 1 n.2. The Court granted both groups permission to participate in the litigation as intervenor-defendants.

The Environmental Plaintiffs, the Marketer Plaintiffs, the EPA, and the Intervenor-Defendants have all moved for summary judgment. In its cross-motion for summary judgment and opposition to the plaintiffs' motions, the EPA conceded that "it has an obligation to conclude review, and any necessary revision, of certain regulations within 40 C.F.R. Part 257 pertaining to [coal ash], and of its 'toxicity characteristic' regulation at 40 C.F.R. § 261.24(b)," and thus conceded the merits of the Environmental Plaintiffs' second and third claims for relief. EPA's Mem. at 1–2. The Intervenor-Defendants, however, raised a number of arguments in opposition to the Environmental Plaintiffs' second and third claims. See Intvs.' Mem. at 11–16, 26–36. In response to the Invervenor-Defendants' argument that the Environmental Plaintiffs lack standing to challenge 40 C.F.R. § 261.24(b) as it related to non-coal ash wastes, the Environmental Plaintiffs clarified that their "claims challenging [the] EPA's failure to complete a review of the

[Leaching Procedure] are limited to the application of the procedure to the determination of the toxicity of coal ash." Envtl. Pls.' Opp'n at 12.  As a consequence of this clarification of their third claim, the EPA withdrew its concession as to the merits of the Environmental Plaintiffs' third claim, and instead also challenged their standing to pursue the claim.  EPA's Reply at 1–2.  The Court will now address the parties' arguments.

## II. STANDARD OF REVIEW

A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," on which the party bears the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  In evaluating a motion for summary judgment, the court must view the evidence "in the light most favorable to the nonmoving party" and must "draw all reasonable inferences in favor of the nonmoving party."  Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to avoid summary judgment.  Anderson, 477 U.S. at 252.  Summary judgment is particularly appropriate when the issues presented for the Court's resolution are primarily questions of law.  Harris v. Dist. of Columbia, 561 F. Supp. 2d 63, 66 (D.D.C. 2008).

## III. ANALYSIS

### A.  The EPA's and the Intervenor-Defendants' Challenges to the Court's Jurisdiction

#### 1.      Statute of Limitations

Notwithstanding the EPA's concession regarding the merits of the Environmental

Plaintiffs' second claim in its cross-motion for summary judgment, the Intervenor-Defendants raise several arguments in opposition to the Environmental Plaintiffs' claims that the EPA does not join. See Intvs.' Mem. at 11–16, 26–29, 31–32. "The general rule in this circuit is that '[i]ntervenors may only argue issues that have been raised by the principal parties.'" Ass'n of Battery Recyclers, Inc. v. EPA, 716 F.3d 667, 675 (D.C. Cir. 2013) (Silberman, J., concurring) (quoting Nat'l Ass'n of Regulatory Utility Comm'rs v. ICC, 41 F.3d 721, 729 (D.C. Cir. 1994)). The Intervenor-Defendants nonetheless seek to argue that this Court lacks jurisdiction over all of the plaintiffs' claims because they were brought outside of the six-year statute of limitations for claims against the United States under 28 U.S.C. § 2401(a). Intvs.' Mem. at 11–16. Because this argument implicates this Court's jurisdiction over the plaintiffs' claims, the Court must address this argument even though the principal parties to this litigation have not raised it. See Ass'n of Battery Recyclers, 716 F.3d at 675 & n.1 (Silberman, J., concurring); cf. Gonzalez v. Thaler, __ U.S. __, __, 132 S.Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented." (citation omitted)).

Section 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues," 28 U.S.C. § 2401(a), and the limitation period "applies to all civil actions whether legal, equitable or mixed," Spannaus v. U.S. DOJ, 824 F.2d 52, 55 (D.C. Cir. 1987). "Statutes of limitations generally fall into two broad categories: affirmative defenses that can be waived and so-called 'jurisdictional' statutes that are not subject to waiver or equitable tolling." John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 140 (2008) (Stevens, J., dissenting). As the name of the latter category implies, a court lacks subject matter jurisdiction to hear a claim that is

barred by a jurisdictional statute of limitations.  See Muwekma Ohlone Tribe v. Salazar, 708 F.3d 209, 218 (D.C. Cir. 2013).  This Circuit "has long held that section 2401(a) creates 'a jurisidictional condition attached to the government's waiver of sovereign immunity,'" and it thus falls into the latter category.  P & V Enters. v. U.S. Army Corps of Eng'rs, 516 F.3d 1021, 1026 (D.C. Cir. 2008) (citing Spannaus, 824 F.2d at 55).

The applicability of § 2401(a) to claims to compel agency action after the agency has failed to meet a statutorily-required deadline for a particular action has yet to be conclusively resolved in this Circuit.  See Conservation Force, Inc. v. Jewell, __ F.3d __, __, 2013 WL 4417452, at *2 (D.C. Cir. 2013) (observing that determination of the applicability of § 2401(a) to claims of agency inaction "will have to await another day" because the claims in the case, which had been dismissed as time-barred under § 2401(a), had become moot during the pendency of the appeal).  In The Wilderness Society v. Norton, 434 F.3d 584 (D.C. Cir. 2006), the Circuit considered a claim analogous to the ones asserted here and suggested in dicta that § 2401(a) would not bar a claim brought more than six years after an agency fails to meet a statutorily-mandated deadline to take a specified action.  434 F.3d at 588–89.  Citing In re United Mine Workers of America International Union, 190 F.3d 545 (D.C. Cir. 1999), and In re Bluewater Network, 234 F.3d 1305 (D.C. Cir. 2000), the Circuit noted that it "has repeatedly refused to hold that actions seeking relief under 5 U.S.C. § 706(1) to 'compel agency action unlawfully withheld or unreasonably delayed' are time-barred if initiated more than six years after an agency fails to meet a statutory deadline."  Wilderness Soc'y, 434 F.3d at 588–89.  Characterizing the plaintiff's claims against the agency as alleging "continuing violations by the Government," the Circuit reasoned that the plaintiff "does not complain about what the agency has done but rather about what the agency has yet to do," and thus the Circuit found that §

2401(a)'s six-year statute of limitations was not applicable.  Id. at 589.  Subsequently, however, other members of this Court have questioned whether the reasoning of Wilderness Society can be reconciled with the Circuit's longstanding precedent classifying § 2401(a) as jurisdictional, and have declined to follow it as dicta that contradicts the Circuit's binding authority.  See Alaska Cmty. Action on Toxics v. U.S. EPA, __ F. Supp. 2d __, __, 2013 WL 1876795, at *9–11 (D.D.C. 2013) (Bates, J.); Conservation Force v. Salazar, 811 F. Supp. 2d 18, 28 n.4 (D.D.C. 2011) (Rothstein, J.), vacated and remanded on other grounds by Conservation Force, __ F.3d __, 2013 WL 4417452 (D.C. Cir. 2013); W. Va. Highlands Conservancy v. Johnson, 540 F. Supp. 2d 125, 139–43 (D.D.C. 2008) (Bates, J.).  But see Sierra Club v. U.S. EPA, 850 F. Supp. 2d 300, 304 (D.D.C. 2012) (Roberts, C.J.) (following Wilderness Society but recognizing discussion on subject is dicta).  The Circuit, meanwhile, has neither consistently endorsed Wilderness Society's discussion of § 2401(a), nor repudiated it.  Compare AKM LLC v. Sec'y of Labor, 675 F.3d 752, 757 n.4 (D.C. Cir. 2012) (noting that Wilderness Society "was in the context of [the court's] mandamus jurisdiction," which "is altogether different than ordinary rights of action"), with id. at 763 n.6 (Garland, C.J., concurring) (explaining that "[a]lthough [the court] did regard the plaintiff's statutory claims as comparable to mandamus, what mattered was that the plaintiff did 'not complain about what the agency ha[d] done but rather about what the agency ha[d] yet to do'" (citation omitted)).

Relying on this Court's decision in West Virginia Highlands Conservancy and cases adopting similar reasoning, the Intervenor-Defendants argue that this Court lacks jurisdiction over the plaintiffs' claims because both the Environmental Plaintiffs and the Marketer Plaintiffs initiated their cases outside of § 2401(a)'s six-year statute of limitations, see Intvs.' Mem. at 11–16, and that due to the jurisdictional nature of § 2401(a), the Court is prohibited from applying

equitable doctrines such as the continuing violation doctrine to excuse the plaintiffs' purportedly untimely filing, see id. at 16–18.  In the Intervenor-Defendants' view, the limitations period of § 2401(a) commenced once three years had elapsed after the EPA's last revision of the relevant regulations, and accordingly the plaintiffs were required to initiate their claims by no later than May 2009, with respect to 40 C.F.R. § 261.4(b)(4) and the Subtitle D regulations, and March 1999, with respect to the Environmental Plaintiffs' claim regarding 40 C.F.R. § 261.24, despite the EPA's ongoing failure to fulfill its statutory obligations.  See Intvs.' Mem. at 13–15.

While the Court agrees that it is bound by controlling authority from this Circuit to treat § 2401(a) as a jurisdictional statute of limitations,[5] see, e.g., P & V Enters., 516 F.3d at 1026, the Court disagrees that § 2401(a) bars the claims asserted here.  "A cause of action against an administrative agency 'first accrues,' within the meaning of § 2401(a), as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court." Spannaus, 824 F.2d at 56 (citations omitted).  The Intervenor-Defendants contend that the plaintiffs "cannot rescue their claims by alleging that EPA's failure to perform its duties under RCRA Section 2002(b) constitutes a 'continuing violation'" because "[t]he continuing violation rule is precisely the type of judicially recognized exception that may be applicable in other contexts, but cannot be applied to the jurisdictional statute of limitations in § 2401(a)."  Intvs.' Mem. at 17.  But this reasoning oversimplifies both plaintiffs' arguments on this point and the

---

[5] The Court notes that the continued vitality of this authority has been the subject of some recent debate.  See Felter v. Kempthorne, 473 F.3d 1255, 1260 (D.C. Cir. 2007) (declining to address whether the continuing violation doctrine or equitable tolling apply to § 2401(a)); Harris v. FAA, 353 F.3d 1006, 1013 n.7 (D.C. Cir. 2004) (declining to resolve whether this Circuit's holding that § 2401(a) is jurisdictional has been undermined by recent Supreme Court decisions); see also P & V Enters., 516 F.3d at 1027 (declining to address prior precedent holding that § 2401(a) is jurisdictional because neither party challenged holding).  As explained below, however, the Court finds that the plaintiffs' action is not time-barred in any event, and so the Court has no need to question whether it must adhere to existing authority on this subject.

application of the "intricate and somewhat confusing" continuing violation doctrine. Earle v. Dist. of Columbia, 707 F.3d 299, 306 (D.C. Cir. 2012) (citation and quotation marks omitted).

The term "continuing violation" has been used to describe two distinct lines of argument. See id. at 306–07. The first, and more common, application of the doctrine pertains to conduct whose "character as a violation did not become clear until it was repeated during the limitations period, typically because it is only its cumulative impact (as in the case of a hostile work environment) that reveals its illegality." Id. at 306 (citation omitted). In such cases, "the statute of limitations begins to run only after the date of the last injury." Keohane v. United States, 669 F.3d 325, 329 (D.C. Cir. 2012) (citation omitted). The second application of the doctrine is when "the text of the pertinent law imposes a continuing obligation to act or refrain from acting." Earle, 707 F.3d at 307. Thus, "where a . . . statute [] imposes a continuing obligation to act, a party can continue to violate it until that obligation is satisfied and the statute of limitations will not begin to run until it does." Id. (alterations in original) (emphasis added) (quoting AKM LLC, 675 F.3d at 763 (Garland, C.J., concurring)). It is the latter application of the doctrine that the plaintiffs urge here. See Envtl. Pls.' Opp'n at 13–16; Marketer Pls.' Opp'n at 27–28.

Determining whether a statute creates a continuing obligation "is a question of statutory construction," which begins, as always, with the plain language of the statute. Earle, 707 F.3d at 307. Section 2002(b) provides that "[e]ach regulation promulgated under this chapter shall be reviewed and, where necessary, revised not less frequently than every three years." 42 U.S.C. § 6912(b). By its plain terms, the statute charges the EPA with the ongoing obligation to review and, if necessary, revise the regulations promulgated under the RCRA every three years. The language is unambiguous in its command and contains no limitation ending the EPA's obligation to undertake such reviews and revisions at least every three years. The interpretation of §

2002(b) as imposing a continuing obligation on the EPA to review and revise its regulations is consistent with the Act's emphasis on the ongoing development of improved solid waste disposal methods.  See 42 U.S.C. § 6902(a)(9).  It is also consistent with the RCRA's citizen suit provision, which permits suit for the present failure of the EPA to perform any non-discretionary act under the RCRA, while providing no relief for prior failures by the agency that have been remedied.  See 42 U.S.C. § 6972(a)(2).  The Court thus concludes that § 2002(b) imposes "a continuing obligation to act" on the EPA, such that the EPA "continue[s] to violate it until that obligation is satisfied."  Earle, 707 F.3d at 307 (citation omitted).

Having concluded that the application of the continuing violation doctrine is appropriate under the circumstances here, the only remaining issue to resolve is whether § 2401(a)'s designation as a jurisdictional statute of limitations prohibits the Court from applying it. Assuming arguendo that labeling a statute of limitations as "jurisdictional" categorically precludes the application of equitable doctrines,[6] the continuing violation doctrine nonetheless applies to determine when a claim accrues, see Earle, 707 F.3d at 306 (describing the continuing violation doctrine as an exception to the "general rule" that "[a] claim normally accrues when the factual and legal prerequisites for filing suit are in place" (alteration in original) (citation and quotation marks omitted)), rather than to excuse the plaintiff's failure to bring a claim that has long-since accrued, cf. McKinney v. U.S. Postal Serv., No. 11-631, 2013 WL 164283, at *3–4 (D.D.C. Jan. 16, 2013) (holding that application of discovery rule was not barred even if §

---

[6] The applicability of equitable doctrines to statutes of limitations that have been categorized as "jurisdictional" is not as conclusively settled as the Intervenor-Defendants' discussion of this issue implies.  Indeed, the language in at least one recent Supreme Court case suggests that the application of equitable doctrines may not be categorically barred.  See John R. Sand & Gravel, 552 U.S. at 133–34 ("The Court has often read the time limits of [jurisdictional] statutes as more absolute, say as requiring a court to decide a timeliness question despite a waiver, or as forbidding a court to consider whether certain equitable considerations warrant extending a limitations period." (emphasis added)); see also McKinney, 2013 WL 164283, at *3 ("In this Court's view . . . whether § 2401(a) is

(continued . . .)

16

2401(a) is a jurisdictional statute of limitations because it governs when the plaintiff's claim

accrues, instead of operating to extend the limitations period due to considerations of equity).

The Court recognizes that other members of this Court have described the continuing violation

doctrine as an equitable exception, and have thus declined to apply it to claims subject to §

2401(a)'s statute of limitations.  See Alaska Cmty. Action on Toxics, __ F. Supp. 2d at __, 2013

WL 1876795, at *10–11; Historic E. Pequots v. Salazar, __ F. Supp. 2d __, __, 2013 WL

1289571, at *6 (D.D.C. 2013); Conservation Force, 811 F. Supp. 2d at 27–28; Keohane v.

United States, 775 F. Supp. 2d 87, 90 (D.D.C. 2011); W. Va. Highlands Conservancy, 540 F.

Supp. 2d at 138.[7]  However, this Court finds the reasoning of those cases to be incompatible with

Earle's discussion of the continuing violation doctrine as a rule governing claim accrual.

Moreover, the Court's conclusion here is consistent with the discussion of the continuing

violation doctrine in Wilderness Society, 434 F.3d at 588–89, and reconciles the reasoning of the

Circuit's dicta with its precedent concerning the jurisdictional nature of § 2401(a).  Accordingly,

the Court finds that § 2401(a) does not bar the action here because the statute of limitations has

not yet run on the plaintiffs' claims.

---

(. . . continued)
jurisdictional in nature, and whether equitable exceptions can apply to extend its limitations period, remain open
questions.").

[7] In Felter v. Norton, 412 F. Supp. 2d 118 (D.D.C. 2006), another member of this Court noted that "[t]raditionally,
when a statute of limitations has been deemed jurisdictional, it has acted as an absolute bar and could not be
overcome by the application of judicially recognized exceptions, such as waiver, estoppel, equitable tolling,
fraudulent concealment, the discovery rule, and the continuing violations doctrine," citing Cato v. United States, 70
F.3d 1103, 1108–09 (9th Cir. 1995), as support for this characterization of the continuing violations doctrine.  412 F.
Supp. 2d at 122 (internal citations omitted).  The cases just cited and decided by other members of the Court relied
on Felter or cases which cite Felter as support for characterizing the continuing violation doctrine as an equitable
exception that cannot be applied to claims subject to § 2401(a).  The Court notes, however, that Cato, the case upon
which Felter relies for its characterization of the continuing violation doctrine, briefly discussed the pro se plaintiff's
invocation of the continuing violation doctrine, but ultimately upheld the district court's dismissal of the case
because of lack of standing and other justiciability problems, not the inapplicability of the continuing violation
doctrine.  See 70 F.3d at 1109–10.

## 2. Standing

Both the EPA and the Intervenor-Defendants raise challenges to the plaintiffs' standing. See EPA's Reply at 10–15; Intvs.' Mem. at 33–37. Because Article III of the Constitution limits the jurisdiction of this Court to the resolution of cases and controversies, "a showing of standing 'is an essential and unchanging' predicate to any exercise of [the Court's] jurisdiction." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). To demonstrate standing, a plaintiff must show that

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–81 (2000) (citation omitted). Associations such as the environmental groups who filed suit here may bring suit on behalf of their members if (1) the association's members would have standing to bring suit in their own right, (2) the interests at stake in the litigation are germane to the association's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members of the association in the litigation. Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342–43 (1977)).

The party that invokes federal jurisdiction bears the burden of establishing the elements of standing "in the same way as any other matter on which the plaintiff bears the burden of proof." Defenders of Wildlife, 504 U.S. at 561. At the summary judgment stage, "[b]are allegations are insufficient," Sierra Club, 292 F.3d at 898, and the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true," Defenders of Wildlife, 504 U.S. at 561. "[A] plaintiff must

demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) (citation and quotation marks omitted). However, "if one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." Comcast Corp. v. FCC, 579 F.3d 1, 6 (D.C. Cir. 2009) (citation omitted).

**i.     The Environmental Plaintiffs' First and Second Claims**

Neither the EPA nor the Intervenor-Defendants contest the Environmental Plaintiffs' standing to bring their first and second claims. The EPA, however, argues that the Marketer Plaintiffs lack standing to pursue their sole claim, see EPA's Mem. at 11–15, which alleges that the EPA violated its non-discretionary duty under § 2002(b) of the RCRA to review and, if necessary, revise its Subtitle D regulations concerning coal ash, see Headwaters Compl. ¶¶ 20–22; Boral Compl. ¶¶ 21–23. This claim is substantially identical to the Environmental Plaintiffs' second claim. See Envtl. Pls.' Compl. ¶¶ 83–85. Nonetheless, the EPA contends that the Marketer Plaintiffs must separately establish standing to assert their claim because the Environmental Plaintiffs propose a different deadline for the EPA to complete its review and potential revision and because the Marketer Plaintiffs also request that the Court order the EPA to issue a final determination as to whether it intends to regulate coal ash under Subtitle C or D of the RCRA, or not at all, and to identify its authority for doing so. See EPA's Reply at 19–21. In the EPA's view, the Marketer Plaintiffs "request that [the] EPA be directed to take a different action, within a different time period, than has been requested by [the] Environmental Plaintiffs." Id.

While there are minor differences in the litigation strategy and relief requested by the Environmental Plaintiffs and the Marketer Plaintiffs, the Court agrees with the Marketer

Plaintiffs that the differences are insignificant. It is well-established that "courts should avoid passing on constitutional issues unless the resolution of these issues is necessary to the disposition of the case." Ry. Labor Execs.' Ass'n v. United States, 987 F.2d 806, 810 (D.C. Cir. 1993). For this reason, when a plaintiff's "presence or absence is of little consequence," a court need not assess the constitutional standing of that plaintiff, even if it adopts a different litigation strategy than the other parties. Id. For example, in Railway Labor Executives Ass'n, this Circuit declined to address the standing of one of two plaintiff organizations even though they challenged different administrative determinations because, despite the differences in approach, their strategies were "based primarily on the same substantive arguments . . . and they [were] designed to achieve the same result." Id. at 810–11. Further, the court found that it could address insignificant arguments raised only by the plaintiff whose standing was in question when those arguments could be "confidently and concisely reject[ed] on the merits." Id. at 811.

Here, the Environmental Plaintiffs and the Marketer Plaintiffs allege the same substantive violation of the RCRA and seek similar, albeit slightly different, relief. Although the parties propose different schedules for the EPA to come into compliance with its statutory obligations, they both ask the Court to reject the EPA's proposed schedule and require its expedited compliance. See [Proposed] Order Granting Plaintiffs' Motion for Summary Judgment at 1–2, ECF No. 19-3 (proposing that review and revision be completed within six months); Marketer Pls.' Mem. at 16–17 (proposing that the EPA announce its regulatory direction within three months). Further, the Court disagrees that the differences in the requested relief constitute requests "to take a different action." EPA's Reply at 20. The Marketer Plaintiffs' complaints both request that the Court order the EPA "to complete a review" of its regulations under Subtitle D and to "promulgate revisions" of its Subtitle D regulations concerning coal ash if it finds that

such revisions are necessary. Headwaters Compl. at 6 ¶¶ 2–3; Boral Compl. at 6–7 ¶¶ 2–3. And

their request that the EPA announce whether it will promulgate regulations under Subtitle C or D

essentially amounts to a timeline for the first part of this requested relief, the EPA's completion

of its review. The Environmental Plaintiffs and the Marketer Plaintiffs thus seek essentially the

same basic result—an order from this Court requiring the EPA to complete a review and revision

of its Subtitle D regulations concerning coal ash "as soon as possible." Compare Envtl. Pls.'

Compl. at 34 ¶ 2, with Headwaters Compl. at 6 ¶¶ 2–3, and Boral Compl. at 6–7 ¶¶ 2–3.

Moreover, because it is clear, as discussed below, that the Court is empowered only to direct the

agency to act, and not to compel it to take any particular action, and therefore cannot order the

EPA to issue a determination of whether it will promulgate regulations concerning coal ash

under Subtitle C or D, the Marketer Plaintiffs' argument on this point can be "confidently and

concisely reject[ed]" on its merits; thus, a lengthy inquiry into the Marketer Plaintiffs'

constitutional standing is unnecessary. Ry. Labor Execs.' Ass'n, 987 F.2d at 811. Accordingly,

the Court finds that the Marketer Plaintiffs need not separately establish their standing because

the Court's "disposition of the main issue[s] of this case is . . . unaffected by [their] presence,"

id., and the Court may therefore rely on the uncontested standing of the Environmental

Plaintiffs[8] to assert their claim.

---

[8] The Court undertook its own inquiry regarding the Environmental Plaintiffs' standing to assert their first and second claims pursuant to its independent obligation to ensure that it has jurisdiction, and is satisfied that the Environmental Plaintiffs have demonstrated standing to pursue these claims. Kathy Little, a member of both the Sierra Club and Kentuckians For The Commonwealth, submitted an affidavit stating that she lives about 100 yards from a coal-fired power plant that contains a coal ash landfill. Envtl. Pls.' Mem., Exhibit ("Ex.") 7 (Declaration of Kathy Little) ¶ 9. Ms. Little stated that "[c]oal ash from the landfill blows all over the neighborhood constantly coating nearby homes with dust that [she] understand[s] to be laden with toxi[n]s" so that she "can't open [her] windows, and still the dust penetrates [her] home and covers [her] furniture." Id. She further alleges that her "use and enjoyment of [her] property has been greatly diminished" because she "would like to be able to open [her] windows, and spend time outside on [her] front porch, but [she] cannot currently do that because of the coal ash contamination." Id. In addition, Ms. Little stated that she "no longer swim[s] or fish[es] in the river due to toxic coal ash from the plant." Id. ¶ 11. The Environmental Plaintiffs have thus shown that Ms. Little is suffering an actual injury to the enjoyment of both her property and nearby recreational areas due to the EPA's alleged failure to

(continued . . .)

ii.        **The Environmental Plaintiffs' Third Claim**

The Environmental Plaintiffs' third claim, as limited in its opposition to summary judgment, asserts that the EPA has violated its non-discretionary duty under § 2002(b) to review and revise, as necessary 40 C.F.R. § 261.24, solely as it relates to coal ash. Envtl. Pls.' Opp'n at 12. The EPA and the Intervenor-Defendants assert that the Environmental Plaintiffs lack standing to pursue this claim because § 261.24 does not apply to coal ash, and so the plaintiffs' alleged harms are not caused by the EPA's failure to review and revise this regulation, nor can their harms be redressed by an order from this Court compelling the EPA to take such action. See EPA's Reply at 10–16; Intvs.' Mem. at 33–35.

The Court agrees with the EPA and the Intervenor-Defendants that the Environmental Plaintiffs lack standing to pursue this claim because coal ash is not subject to 40 C.F.R. § 261.24.[9] The EPA promulgated its toxicity characteristic regulation pursuant to § 3001(a) of Subtitle C of the RCRA, which requires the EPA to "develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to the provisions of this subtitle." Resource Conservation and Recovery Act of 1976 § 3001(a), 42 U.S.C. § 6921(a). Coal ash, however, is expressly exempted from regulation under Subtitle C by the Bevill Amendment in accordance with the EPA's regulatory determinations. See 42 U.S.C. §§ 6921(b)(3)(A)(i), (b)(3)(C). Thus, the toxicity characteristic, which only

---

(. . . continued)

undertake its required review and revision of its regulation exempting coal ash from regulation as a hazardous waste under Subtitle C and its regulations concerning coal ash under Subtitle D, and that an order from this Court compelling the EPA to undertake such review and revision would likely redress the harm alleged. See Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1266 (D.C. Cir. 2004); cf. La. Envtl. Action Network v. U.S. EPA, 172 F.3d 65, 67–68 (D.C. Cir. 1999). Because the Sierra Club and Kentuckians For The Commonwealth have associational standing to bring suit by virtue of Ms. Little's standing, the Court finds that the Environmental Plaintiffs have met their burden to establish standing to pursue their first and second claims.

[9] Because the Environmental Plaintiffs have clarified that their third claim is for review and revision of 40 C.F.R. §

(continued . . .)

applies to wastes that should be regulated under Subtitle C, is not applicable to coal ash, which is explicitly exempted from regulation under Subtitle C.  It is true, as the Environmental Plaintiffs point out, and the EPA admits, see EPA's Reply at 11 n.6, that there is no "bright line between hazardous waste and solid waste, where the [Leaching Procedure] test applies only to hazardous waste and is irrelevant for solid wastes," Envtl. Pls.' Opp'n at 30 n.16, to the extent that some wastes are excluded from regulation as hazardous because they do not exhibit toxicity as defined by 40 C.F.R. § 261.24.  But this argument ignores the Bevill Amendment's express exemption of coal ash from regulation under Subtitle C.  If the Court granted the Environmental Plaintiffs' requested relief on this claim and the EPA undertook a revision of § 261.24, the plaintiffs' alleged harms would remain because coal ash would continue to be exempted from regulation under Subtitle C regardless of whether it exhibited toxicity under a new testing procedure.

The Environmental Plaintiffs' efforts to cure these causation and redressability problems are unavailing.  They argue that standing is satisfied here because "[h]istorically, [the] EPA has relied upon the [Leaching Procedure] to characterize coal ash, and it will continue to rely upon [it] to evaluate the toxicity of coal ash in its ongoing rulemaking process unless it is ordered to review and revise the toxicity characteristic and [Leaching Procedure] regulations."  Envtl. Pls.' Opp'n at 31–33.  While it is true that the EPA has relied on the results of the Leaching Procedure as one factor in its determination not to regulate coal ash as a hazardous waste, see, e.g., 58 Fed. Reg. at 42,467–68; id. at 42,472, the EPA also cited numerous other considerations in its determination, see, e.g., id. at 42,472–73 (cases of damage caused by the wastes); id. at 42,476 (current industry practices); id. at 42,477 (comments).  Indeed, the EPA's 1993 Bevill

<hr>

(. . . continued)
261.24 solely as it relates to coal ash, the Court need not address the Intervenor-Defendants' standing arguments with respect to the Environmental Plaintiffs' ability to challenge the rule as to other wastes.

Amendment regulatory determination expressly stated that while it considered the results of the Leaching Procedure, "they are not the sole basis for determining whether to regulate fossil-fuel combustion wastes under RCRA Subtitle C." Id. at 42,472. Because the EPA relied on multiple other factors to sustain its decision not to regulate coal ash as a hazardous waste, the Environmental Plaintiffs have not established that the EPA's failure to, in the plaintiffs' view, appropriately revise 40 C.F.R. § 261.24, actually caused their alleged harms resulting from the inadequate regulation of coal ash. See Cnty. of Delaware, Pa. v. Dep't of Transp., 554 F.3d 143, 149 (D.C. Cir. 2009) (holding that plaintiffs could not establish that agency's reliance on regulation caused their injury where regulation was only one of two alternative grounds for its decision).

The Environmental Plaintiffs face a similar problem under the redressability prong of the standing inquiry. It is conceivable, as the Environmental Plaintiffs suggest, that revision of § 261.24 may result in a determination by the EPA that coal ash should be regulated as a hazardous waste based, in part, on the results of the Leaching Procedure. See Envtl. Pls.' Opp'n at 30–33. However, unlike the cases cited by the Environmental Plaintiffs, the uncertainty here is not just whether the agency will adopt a plaintiff's position on the subject when forced by court order to act. See, e.g., Defenders of Wildlife, 504 U.S. at 572 n.7 (explaining that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered"). Rather, the uncertainty here is three-fold: first, whether the EPA will revise § 261.24 as the Environmental Plaintiffs hope, and then, whether the EPA will use the results of the revised Leaching Procedure to determine that coal ash should be regulated as hazardous, assuming the

results show that coal ash exhibits toxicity, and finally, whether the EPA will determine that coal ash should be regulated under Subtitle C in view of all of the other factors considered by the EPA in making this determination.  While the redressability requirement is lowered in cases challenging agency action, the Environmental Plaintiffs' argument here simply has too many layers of uncertainty to say that "the relief sought . . . will <u>likely</u> alleviate the particularized injury alleged."  <u>Cnty. of Delaware</u>, 554 F.3d at 149 (emphasis added) (citation and quotation marks omitted).

The Environmental Plaintiffs attempt to bolster their standing arguments by pointing out that the "EPA's toxicity characteristic and [Leaching Procedure] are commonly used by state regulators to exempt coal ash disposal from basic waste disposal requirements."  Envtl. Pls.' Opp'n at 33–36.  But standing ordinarily cannot depend on the actions of third parties who are not before the Court and who will not be bound by the Court's decision.  <u>See</u> <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 41–42 (1976) (Article III "requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court").  Unlike <u>National Parks Conservation Ass'n v. Manson</u>, 414 F.3d 1 (D.C. Cir. 2005), on which the Environmental Plaintiffs rely, <u>see</u> Envtl. Pls.' Opp'n at 36, there is no requirement that any state use the EPA's toxicity characteristic or Leaching Procedure in its own promulgation of hazardous waste regulations, and therefore, there is no certainty whatsoever that an order from this Court granting the plaintiffs' requested relief will have any impact on states' independent regulatory decisions, <u>see</u> <u>Nat'l Parks Conservation Ass'n</u>, 414 F.3d at 3 (finding that redressability was satisfied because federal agency action "doubtless would significantly affect" state proceedings since the state agency was required to explain its decision to ignore a federal

report on the issue if it chose to act in opposition, even though state agency retained final decision-making authority). Thus, it cannot be assumed with any degree of certainty that an order from this Court granting the plaintiffs the relief they request will change any particular state's independent regulatory decisions regarding coal ash.

In sum, the Environmental Plaintiffs' alleged harms resulting from the EPA's failure to, in their view, adequately regulate coal ash, are not sufficiently caused by the EPA's failure to review and revise the toxicity characteristic and are not likely to be redressed by the EPA's satisfaction of its statutory obligation to do so. The Environmental Plaintiffs' third claim must therefore be dismissed for lack of standing.

### 3. Mootness and Ripeness

Finally, the Intervenor-Defendants argue that this Court lacks jurisdiction over the Environmental Plaintiffs' claim regarding review and revision of the EPA's Subtitle D regulations concerning coal ash (their second claim) because it is moot, and at the same time, argue confusingly that this matter is not yet ripe. Intvs.' Mem. at 29–31. A claim is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome" so that "the court can provide no effective remedy because a party has already 'obtained all the relief that [it has] sought.'" Conservation Force, __ F.3d at __, 2013 WL 4417452, at *2 (citations omitted). The Intervenor-Defendants assert that because the EPA has already initiated its review of its Subtitle D regulations concerning coal ash, the EPA is in compliance with its duty under § 2002(b), and thus, the Court is without power to order any relief. Intvs.' Mem. at 29–31. While the EPA's June 2010 notice of proposed rulemaking may indicate that it is undertaking a review of its Subtitle D regulations concerning coal ash, it has not completed the review and any necessary revision of its regulations as required by § 2002(b), as

the EPA itself concedes.  EPA's Mem. at 1–2.  Accordingly, the Court can still order relief and thus the Environmental Plaintiffs' and the Marketer Plaintiffs' shared claim is not moot.  Cf. Conservation Force, __ F.3d at __, 2013 WL 4417452, at *2–3 (finding that plaintiffs' claim regarding agency's obligation to issue determination within statutorily-mandated timeframe was moot when agency completed review and issued determination, even though untimely).

The Intervenor-Defendants' argument that the plaintiffs' shared claim is not yet ripe because the EPA has not yet failed to complete its revision within three years similarly fails.  The EPA's revision of its Subtitle D regulations has been delayed longer than three years, as the EPA itself concedes.  See EPA's Mem. at 1–2.  The Intervenor-Defendants' ripeness argument is therefore rejected.

Having now resolved all of the EPA's and the Intervenor-Defendants' arguments concerning the justiciability of the claims asserted in this case, the Court will turn to the merits of the Environmental Plaintiffs' first claim and the Environmental Plaintiffs' and the Marketer Plaintiffs' shared claim.

## B.  Exemption of Coal Ash from Regulation as a Hazardous Waste

The Environmental Plaintiffs allege that the EPA has violated its non-discretionary duty under § 2002(b) of the RCRA to review, and if necessary, revise its regulatory exemption of coal ash from regulation under Subtitle C, 40 C.F.R. § 261.4(b)(4).  Envtl. Pls.' Compl. ¶¶ 80–82. The EPA responds that it does not have a non-discretionary duty to review and revise this regulation because its regulatory powers with respect to the coal ash exemption are constrained by the Bevill Amendment.  See EPA's Mem. at 17–19; EPA's Reply at 2–4.  The Intervenor-Defendants agree that the EPA does not have a non-discretionary duty to take any action concerning this regulation, but further contend that the EPA has no authority to revise it at all,

Intvs.' Mem. at 18–26, a position with which the EPA disagrees, EPA's Reply at 4. Whether the EPA has the authority to revise its regulatory exemption of coal ash from regulation under Subtitle C is not the issue before this Court, however, and since the Court does not need to reach this issue to resolve the claim before it, the Court expresses no opinion on it. The sole issue before this Court is whether the EPA has a non-discretionary duty to review and revise § 261.4(b)(4) under § 2002(b) of the RCRA. Because § 261.4(b)(4) is simply a regulatory codification of the Bevill Amendment's statutory exemption of coal ash from regulation under Subtitle C, the Court concludes that the EPA does not have a non-discretionary duty to review and, if necessary, revise it every three years.

The Bevill Amendment provides that coal ash

shall . . . be subject only to regulation under other applicable provisions of Federal or State law in lieu of this subchapter until at least six months after the date of submission of the applicable study required to be conducted under [42 U.S.C. § 6982(n)] and after promulgation of regulations in accordance with subparagraph (C) of this paragraph.

42 U.S.C. § 6921(b)(3)(A). Subparagraph (C) then provides that after completing the study required by 42 U.S.C. § 6982(n), "the Administrator shall, after public hearings and opportunity for comment, either determine to promulgate regulations under this subchapter . . . or determine that such regulations are unwarranted." 42 U.S.C. § 6921(b)(3)(C). Whether these statutory provisions create a one-time obligation, as the Intervenor-Defendants contend, or whether they create a process which the EPA must follow before regulating coal ash under Subtitle C, as the EPA argues, it is clear that the Bevill Amendment removes the regulation of coal ash as a hazardous waste from the RCRA's general regulatory scheme by creating a different process for regulating coal ash as hazardous waste. Assuming that the Bevill Amendment does not create a one-time process, the statute unequivocally provides that the EPA cannot regulate coal ash under Subtitle C until after it determines that regulation is warranted and promulgates regulations

accordingly.  This process, specific to Bevill wastes, removes § 261.4(b)(4) from the purview of § 2002(b), the RCRA's general review and revision provision.

In support of its position that it does not have a non-discretionary duty to review and revise § 261.4(b)(4), the EPA cites American Portland Cement Alliance v. EPA, 101 F.3d 772 (D.C. Cir. 1996), where this Circuit discussed whether the "determinations" required under the Bevill Amendment were considered "regulations" within the meaning of the RCRA's judicial review provision, which provides the Circuit with original jurisdiction over petitions for review of the EPA's action "in promulgating any regulation . . . or denying any petition for the promulgation, amendment or repeal of any regulation" under the RCRA.  Id. at 774–76 (quoting 42 U.S.C. § 6976(a)).  The Circuit reasoned that the RCRA differentiates between "regulations" and "determinations" and that the plain language of the statute therefore deprived it of jurisdiction over Bevill Amendment regulatory determinations.  Id. at 775–76.  Because the issue here concerns a regulation, albeit a regulation based on a regulatory determination, American Portland Cement Alliance is not directly on point.  However, the Circuit's discussion of the different status of Bevill Amendment regulatory determinations supports the Court's conclusion here that the Bevill Amendment carves out a distinct regulatory process for Bevill wastes that does not fall within the EPA's routine regulatory authority under the RCRA.  In light of the exception specifically created for the regulation of Bevill wastes from the EPA's general authority to promulgate regulations under Subtitles C and D, § 2002(b)'s general requirement is inapplicable to § 261.4(b)(4), and the Environmental Plaintiffs' first claim must be dismissed.

### C.  Subtitle D Regulations Concerning Coal Ash

The sole remaining claim for relief, the Environmental Plaintiffs' and Marketer Plaintiffs' shared claim, is that the EPA has failed to perform its nondiscretionary duty under § 2002(b) of

the RCRA to complete its review and, if necessary, revision of the Subtitle D regulations concerning coal ash at least every three years.  Envtl. Pls.' Compl. ¶¶ 83–85; Headwaters Compl. ¶¶ 20–22; Boral Compl. ¶¶ 21–23.  As the Court previously noted, the EPA has conceded that "it has an obligation to conclude review, and any necessary revision, of certain regulations within 40 C.F.R. Part 257 pertaining to coal combustion residuals."  EPA's Mem. at 1–2.  In addition to the justiciability arguments just discussed, the Intervenor-Defendants also argue that granting summary judgment to the Environmental Plaintiffs and the Marketer Plaintiffs on this claim is inappropriate because the EPA's review and revision of the regulations concerning coal ash under Subtitle D is a discretionary duty that the Court cannot compel the EPA to undertake. Intvs.' Mem. at 27–29.  Although the Intervenor-Defendants did not style their argument in this manner, other members of this Court have interpreted provisions similar to 42 U.S.C. § 6972 as requiring that the Court determine that a duty is non-discretionary in order to exercise subject matter jurisdiction over the claim.  See, e.g., Friends of the Earth v. U.S. EPA, __ F. Supp. 2d __, __, 2013 WL 1226822, at *5–7 (D.D.C. 2013); Defenders of Wildlife v. Jackson, 284 F.R.D. 1, 4 (D.D.C. 2012).  Thus, out of an abundance of caution, the Court will address the Intervenor-Defendants' argument that the EPA does not have a non-discretionary duty to review and revise its Subtitle D regulations concerning coal ash despite the EPA's concession.

A statute may create a non-discretionary duty by setting forth a date certain by which an agency must comply with an obligation, or by providing a deadline that is "readily-ascertainable by reference to some other fixed date or event."  Sierra Club v. Thomas, 828 F.2d 783, 790–91 (D.C. Cir. 1987).  In a suit seeking to enforce a non-discretionary duty, "the only required judicial role would be to make a clear-cut factual determination of whether a violation did or did not occur."  Id. at 791.  Thus, "it is highly improbable that a deadline will ever be

nondiscretionary, i.e. clear-cut, if it exists only by reason of an inference drawn from the overall statutory framework." Id. (citation and quotation marks omitted).

Beginning with the plain language of the statute, § 2002(b) provides that "[e]ach regulation promulgated under this Act shall be reviewed and, where necessary, revised not less frequently than every three years." Resource Conservation and Recovery Act of 1976 § 2002(b), 42 U.S.C. § 6912(b) (emphasis added). Use of the word "shall" in a statute generally creates a mandatory duty, Bennett v. Spear, 520 U.S. 154, 175 (1997), here imposing a requirement that the EPA review and, if necessary, revise each regulation promulgated under the RCRA at least every three years. And although § 2002(b) does not set forth a date certain by which the EPA must review and make any necessary revision, it imposes a recurring obligation on the EPA that is "readily-ascertainable" by reference to the date of the regulation's promulgation. See Defenders of Wildlife, 284 F.R.D. at 4 (finding that Clean Water Act provision that required review and, if necessary, revision of regulations every five years imposed a non-discretionary duty). Nor does the discretion accorded by the statute to determine whether a revision is necessary and the substance of an appropriate revision selected by the EPA convert this mandatory duty to a discretionary one, as "'[i]t is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.'" Sierra Club v. Leavitt, 355 F. Supp. 2d 544, 550 (D.D.C. 2005) (Walton, J.) (quoting Bennett, 520 U.S. at 172). Indeed, the United States Court of Appeals for the Second Circuit, considering a similarly-worded provision of the Clean Air Act, found that the provision at issue there imposed a non-discretionary duty on the EPA "to make some formal decision whether to revise" standards mandated by the Clean Air Act, even though the district court had no jurisdiction to order any particular revision. Envtl. Def. Fund v. Thomas, 870 F.2d

892, 898–900 (2d Cir. 1989).  Accordingly, the Court finds that § 2002(b) creates a non-discretionary duty requiring the EPA to undertake a review and, if necessary, revision of each regulation promulgated under the RCRA at least every three years.

The Intervenor-Defendants argue, however, that even if § 2002(b) creates a general non-discretionary duty, § 2002(b) is not applicable to the EPA's Subtitle D regulations concerning coal ash.  Intvs.' Mem. at 27–29.  In the Intervenor-Defendants' view, § 1008(a) controls because Subtitle D regulations are promulgated pursuant to § 1008(a), id., which provides that "[w]ithin one year of enactment of this section, and from time to time thereafter, the Administrator shall, in cooperation with appropriate Federal, State, municipal, and intermunicipal agencies, and in consultation with other interested parties, and after public hearing, develop and publish suggested guidelines for solid waste management," Resource Conservation and Recovery Act of 1976 § 1008(a), 42 U.S.C. § 6907(a).  The Court discerns no apparent conflict between Sections 1008(a) and 2002(b).  By their plain language, § 1008(a) governs the initial promulgation of regulations, and § 2002(b) governs their periodic review and revision.  Thus, § 1008(a) need not be adopted as the controlling provision at the expense of § 2002(b).  Moreover, the plain language of § 2002(b), that is set forth in Subtitle B, and which establishes the Office of Solid Waste and vests the EPA with the authority to execute the RCRA, expressly states that the review and revision requirement applies to "[e]ach regulation promulgated under the Act."  Id. § 2002(b).  Accordingly, the Court finds that § 2002(b) creates a non-discretionary duty that may be enforced pursuant to the RCRA's citizen suit provision, 42 U.S.C. § 6972(b).

The only remaining disputes regarding this claim concern the scope of relief that the Court can and should order.  As mentioned previously, the Marketer Plaintiffs request that the

Court order the EPA to announce its regulatory direction within three months of this Court's decision and also identify its regulatory authority. Marketer Pls.' Mem. at 16–17. However, the clear terms of the citizen suit provision state that this Court has jurisdiction only to "order the Administrator to perform such act or duty as the case may be." 42 U.S.C. § 6972(a). The Court thus cannot dictate to the agency the outcome of its review and revision, but only that it must undertake a review and revision in accordance with its non-discretionary duty to do so. See Thomas, 870 F.2d at 899 (holding that while district court had jurisdiction to order agency to take some action, "the content of that decision [was] within the Administrator's discretion"); cf. Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 65 (2004) ("Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be.").

Finally, the parties disagree as to the rapidity with which the EPA must conclude its review and issue revised regulations if deemed necessary. The Environmental Plaintiffs request that the Court order the EPA to conclude its review and revision within six months of this Court's order. [Proposed] Order Granting Plaintiffs' Motion for Summary Judgment at 1–2, ECF No. 19-3. The EPA, on the other hand, asks that the Court defer setting a deadline for the EPA's completion of review and promulgation of any necessary revisions, and instead permit the Agency to file a brief within six months of this Court's decision proposing a final deadline. EPA's Mem. at 27. The EPA represents in its briefs that the Agency is currently in the process of conducting its review of the regulations at issue, and insists that it needs additional time in order to "review these regulations in a manner that will result in an outcome that is scientifically

sound and legally defensible."  EPA's Mem. at 19–20; EPA's Mem., Exhibit ("Ex.") 1

(Declaration of Suzanne Rudzinski ("Rudzinski Decl.")) ¶ 26.

A court enforcing a statutory obligation to perform a non-discretionary duty "may

exercise its equity power 'to set enforceable deadlines both of an ultimate and an intermediate

nature.'"  Sierra Club v. Johnson, 444 F. Supp. 2d 46, 52 (D.D.C. 2006) (quoting NRDC v.

Train, 510 F.2d 692, 705 (D.C. Cir. 1974)).  However, a court "may afford an agency additional

time for compliance[] 'where it is convinced by the official involved that he has in good faith

employed the utmost diligence in discharging his statutory responsibilities.'"  Id. (quoting

NRDC, 510 F.2d at 713).  Generally, courts reject agency arguments that amount to no more

than a general desire to further study an issue before acting, see Sierra Club v. Ruckelshaus, 602

F. Supp. 892, 899 (N.D. Cal. 1984), but in determining appropriate relief, a court is also charged

to "separate justifications grounded in the purposes of the Act from the footdragging efforts of a

delinquent agency," NRDC, 510 F.2d at 713.

The Court is sensitive to the EPA's desire to conduct its review and revision of the

regulations at issue in a responsible fashion and is cognizant that the Agency is in the best

position to assess the time in which it will be able to do so.  However, the Court cannot permit

the EPA to set its own schedule to the extent that the EPA's non-discretionary duty is pursued in

a manner dictated solely by the Agency's discretion.  See Sierra Club v. Browner, 130 F. Supp.

2d 78, 95 (D.D.C. 2001).  In view of the competing considerations at stake here, the Court finds

it prudent to require the EPA to submit a proposed scheduling order setting forth a proposed

deadline by which it will comply with its statutory obligations, particularly given the progress

that the Agency presumably would have already made while the motions that have been

addressed in this opinion were being briefed and then were under consideration by the Court.

For example, the EPA cites the need to review the 450,000 comments it received on its proposed rule as a primary objection to the plaintiffs' proposed deadline. EPA's Mem., Ex. 1 (Rudzinski Decl.) ¶¶ 22, 26. But given the time that has already elapsed and the EPA's recognition of the need to revise its coal ash regulations, it is entirely possible that review of these comments has now been completed and no longer stands as a barrier to expedited completion of the process. The Court therefore requires updated information from the Agency regarding the status of its review and revision to properly fashion a schedule for the EPA's compliance with its obligation to review and revise if necessary its Subtitle D regulations concerning coal ash. The EPA requests six months to make this determination, but considering the time that has elapsed since that request was made, the Court finds that sixty days is sufficient.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it must grant summary judgment to the EPA on the Environmental Plaintiffs' first and third claims, and that it must grant summary judgment to the Environmental Plaintiffs and the Marketer Plaintiffs on their shared claim. As to this shared claim, the EPA shall advise the Court within sixty days of this Court's decision of when it proposes to complete its review and revision of its Subtitle D regulations concerning coal ash. The plaintiffs may then file a response to the EPA's proposal in accordance with the schedule set forth in the order accompanying this opinion.

**SO ORDERED** this 29th day of October, 2013.[10]

REGGIE B. WALTON
United States District Judge

---

[10] An order consistent with this Memorandum Opinion shall be issued contemporaneously.